AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>MANUEL DE JESUS THOMAS, DOB xx/xx/1972<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 21-M-461 (SCD)<br>)<br>)<br>)<br>) |



CLERK'S OFFICE
A TRUE COPY
Aug 11, 2021
s/ JeremyHeacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  January 2015 - November 2020  in the county of  Milwaukee  in the
 Eastern  District of  Wisconsin , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, USC, Sections 841, 846, 856 | Distributing controlled substances, conspiring to distribute controlled substances, and maintaining a premises for the purpose of distributing controlled substances, all without a legitimate medical purpose and outside the usual course of standard professional practice and in violation of Title 21, United States Code, Sections 841, 846, and 856. |

This criminal complaint is based on these facts:
Please see attached Affidavit.

☑ Continued on the attached sheet.

FRANK MARINO  Digitally signed by FRANK MARINO
Date: 2021.08.11 11:44:16 -05'00'

*Complainant's signature*

DEA SA Frank Marino
*Printed name and title*

Sworn via telephone; transmitted via email pursuant to Fed. R. Crim. P. 4.1

~~Sworn to before me and signed in my presence.~~

Date:  8-11-21

*Judge's signature*

City and state:  Milwaukee, Wisconsin    Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Frank A. Marino, being first duly sworn, herby depose and state as follows:

## I. INTRODUCTION

1. I make this affidavit for the limited purpose of establishing probable cause for the issuance of a criminal complaint and arrest warrant charging defendant Manuel de Jesus Thomas, M.D. (DOB: XX/XX/1972) (hereinafter "Dr. Thomas"), with: distributing controlled substances without a legitimate medical purpose and outside the usual course of standard professional practice, in violation of Title 21, United States Code, Section 841(a)(1); conspiring to distribute controlled substances without a legitimate medical purpose and outside the usual course of standard professional practice, in violation of Title 21, United States Code, Section 846; and maintaining a premises for the purpose of distributing controlled substances without a legitimate medical purpose and outside the usual course of standard professional practice, in violation of Title 21, United States Code, Section 856(a)(1).

## II. BACKGROUND AND EXPERIENCE

2. I am a Special Agent assigned to the Milwaukee District Office of the Drug Enforcement Administration (DEA) and have been so employed since May of 2015.

3. I am assigned to the DEA's Milwaukee District Office (MDO) Tactical Diversion Squad, Group 67. I am charged with investigating the diversion of controlled substances. Currently my collateral duties include firearms instructor, tactical instructor, emergency medical technician and Special Response Team member. I was previously assigned to the Los Angeles Field Division (LAFD) Clandestine Laboratory Enforcement Team. Before joining DEA, I was employed as a police officer for the Chicago Police Department for

approximately three and a half years.

4. I have received specialized training concerning violations of the Controlled Substances Act while attending the DEA Training Academy in Quantico, Virginia. During my tenure at the DEA, I have been involved in investigations regarding the unlawful importation, exportation, manufacture, possession, and distribution of narcotics (including cocaine, heroin, methamphetamine, pharmaceuticals, phencyclidine (PCP), and marijuana), the laundering of narcotics proceeds and monetary instruments derived from narcotics activities, and conspiracies associated with narcotics offenses. My involvement in these investigations has included debriefing defendants, witnesses, and confidential informants; conducting physical and electronic surveillance; assisting in court-authorized interceptions; executing search warrants and arrest warrants; seizing narcotics and narcotics-related assets; making arrests for narcotics-related offenses; and analyzing documents and records related to drug-trafficking activities and money.

5. This affidavit is based upon my personal knowledge and upon information reported to me by other law enforcement personnel, known to be truthful and reliable.

6. This affidavit is intended to demonstrate probable cause for the requested criminal complaint and arrest warrant and does not set forth all of my knowledge about this matter.

### III. BACKGROUND

7. During the times relevant to this Affidavit, Dr. Thomas held DEA Registration No. BT8998241, and had authorization to prescribe and dispense controlled substances pursuant to 21 U.S.C. § 823(f). Dr. Thomas held a valid Wisconsin Medical License, 47171-20, until October 21, 2020, when it was suspended by the Medical Licensing Board of Wisconsin.

8. According to the Wisconsin Department of Financial Institutions, Dr. Thomas incorporated Viva Advanced Healthcare, Inc. in the State of Wisconsin on July 13, 2013, and he was the Registered Agent of that same entity. In either 2015 or 2016, Dr. Thomas relocated Viva Advanced Healthcare, Inc. to 1107 W. Oklahoma Avenue, Milwaukee, Wisconsin 53215. Dr. Thomas operated his putative medical practice out of this Oklahoma Avenue location until he was evicted in September 2020.

9. As more fully recounted below, DEA investigated Dr. Thomas for the Subject Offenses, which included multiple undercover visits to the previously mentioned Oklahoma Avenue location; numerous witness interviews; the review of prescriptions authorized by Dr. Thomas; a search warrant at the Oklahoma Avenue location; and consultation with medical experts regarding Dr. Thomas' prescribing practices.

### IV. PROBABLE CAUSE

*R.R.*

10. On June 6, 2018 and August 1, 2018, investigators interviewed R.R., a former employee of Dr. Thomas. R.R. worked for Dr. Thomas from approximately January 2014 through March 2015. She was a Registered Nurse in Puerto Rico, but after moving to Wisconsin she worked as a Medical Assistant. R.R. reported that Dr. Thomas routinely made employees and patients at the Oklahoma Avenue location pick up medications from various pharmacies, including controlled substances, and convey those medications to him. She also reported that there were times when patients did not see Dr. Thomas, but those same patients were charged for an office visit and given prescriptions. R.R. also stated that Dr. Thomas would sign blank prescription forms in a certain spot, so his

employees could run the form through an office printer and thereby generate a fraudulent prescription that appeared authentic when Dr. Thomas was not at the office.

*L.G.*

11. Between January 2015 and May 2019, Dr. Thomas issued 215 prescriptions for controlled substances—including 182 prescriptions for Schedule II opioids and 18 prescriptions for a Schedule II amphetamine—to L.G. On August 6, 2020, investigators interviewed L.G., and she admitted that she was addicted to the opioids prescribed by Dr. Thomas. She stated that she told Dr. Thomas that she was addicted—and had in fact been to "rehab" for addiction three times while she was Dr. Thomas's patient—yet he continued to prescribe her opioids. L.G. stated that she was required by Dr. Thomas to pay him additional cash to obtain these prescriptions because—according to Dr. Thomas—"insurance didn't pay enough." She stated that Dr. Thomas made patients come to his office for appointments every two weeks because Dr. Thomas made more money that way. L.G. also advised that she provided all of the Schedule II amphetamine prescribed to her by Dr. Thomas to him.

12. Robert A. Chambers, M.D., who is Board Certified in Psychiatry and a recognized expert in the field of addiction medicine, was retained by DEA to review Dr. Thomas's medical records and provide an expert analysis of them. Dr. Chambers reviewed Dr. Thomas's medical records for L.G. and concluded, in part, that L.G. showed clear evidence of opioid addiction, yet this diagnosis was never made or acted upon by Dr. Thomas. In fact, according to Dr. Chambers, Dr. Thomas was fueling L.G.'s addition by virtue of his prescribing practices. Dr Chambers also described deficiencies in Dr. Thomas's clinical monitoring, noting that Dr. Thomas's use of urine drug screening in L.G.'s case was

grossly inadequate and substandard. Dr. Chambers further opined that the urine drug screening that Dr. Thomas did perform with L.G. amounted to an effort to "pad the chart and create a façade of legitimate practice." What's more, Dr. Thomas's "patterns of prescribing and bizarre and grossly inadequate documentation make [sic] Thomas's practice appear as if he is a giant human vending machine for prescription drugs and controlled substances, for which no medical expertise is being employed to gate and monitor dispensations."

*A.A.*

13. Between April 2017 and July 2017, Dr. Thomas issued seven prescriptions for a Schedule II opioid in the name of A.A., a minor child of L.G., ostensibly for an "unspecified fracture of right femur." In fact, A.A. never had this injury. L.G. explained to investigators that while these opioids were prescribed for A.A., they were intended for her mother L.G., as Dr. Thomas then knew. Dr. Thomas himself had suggested prescribing in this manner to L.G., to deflect attention from his prescribing practices.

14. Dr. Chambers, the medical expert obtained by DEA, reviewed Dr. Thomas's medical records for A.A. and concluded, in part, that Dr. Thomas's "diagnosis" of a femur fracture was not supported by any evidence presented in the record and that Dr. Thomas's prescribing habits, as reflected in the records he reviewed, may rise to the level of a "chemical assault."

*K.P.*

15. Between September 2015 and August 2017, Dr. Thomas issued 35 prescriptions for controlled substance—including 18 for a Schedule II opioid— in the name of K.P., another minor child of L.G. At least nine of the opioid prescriptions for K.P. contained

5

diagnosis codes indicating the opioid at issue was for "dysmenorrhea, unspecified" or "pelvic and perineal pain." Here again, according to L.G., these opioids were intended for L.G., as Dr. Thomas suggested prescribing in this manner to deflect attention from his prescribing practices.

16. On February 8, 2021, K.P. was interviewed by investigators and stated that she never had the medical conditions Dr. Thomas noted on many of the opioid prescriptions in her name; was not aware of the opioid prescriptions in her name; and did not take any of the opioids at issue. K.P. also confirmed that her sibling A.A. never broke her leg.

17. Dr. Chambers, the medical expert obtained by DEA, reviewed Dr. Thomas's medical records for K.P., finding once again that the prescriptions in her name were not supported by the medical evidence available and that the prescribing pattern reflected in the records he reviewed may constitute a "chemical assault."

*Y.M.*

18. Between January 2014 and November 2020, Dr. Thomas issued 384 prescriptions for controlled substances—including 224 for a Schedule II opioid, 58 for a Schedule II amphetamine, and 65 for a Schedule IV benzodiazepine—to Y.M. On August 2, 2020 and February 3, 2021, Y.M. was interviewed by investigators and admitted that she was addicted to the controlled substances prescribed by Dr. Thomas. What's more, Y.M. had been to "rehab" several times during the time she was a patient of Dr. Thomas, but nevertheless continued to receive opioid prescriptions from him . She reported that the last time she got controlled substance prescriptions from Dr. Thomas was around November 23, 2020, at which point she met him in a strip mall parking lot because he no

longer had an office. Investigators also know that this particular prescription was issued after Dr. Thomas's license had been suspended.

19. Dr. Chambers, the medical expert obtained by DEA, opined, based on his review of the relevant records, that there was no credible medical justification for Dr. Thomas's prescriptions issued in Y.M.'s name.

*A.W.*

20. Between December 2013 and February 2018, Dr. Thomas issued 108 prescriptions for Schedule II opioids to A.W. On June 7, 2019, A.W. was interviewed by investigators. At that time, A.W. advised that during a usual visit, she would first wait for at least one or two hours to see Dr. Thomas, only to interact with him for approximately three-to-four minutes. During most appointments, A.W. would tell Dr. Thomas she was fine and was just there for refills, at which point he would leave the room and return with the prescriptions. A.W. stated that she was addicted to the opioids that Dr. Thomas prescribed, which he knew, based on their conversations.

21. A.W. also told investigators that drug use was common at Dr. Thomas's office. Per A.W., patients, while waiting for Dr. Thomas, would commonly ask her, "do you party?"—common vernacular for asking if someone wants to use or deal drugs. She further reported that drug use occurred all around Dr. Thomas's office, including the parking lot in back, in front of the office, and the side streets.

22. Dr. Chambers, the medical expert obtained by DEA, reviewed Dr. Thomas's medical records for A.W. and described Dr. Thomas's treatment of A.W. as a "chemical assault," by virtue of Dr. Thomas's many inappropriate and unsupported opioid prescriptions to A.W.

7

*J.H.*

23. From June 2016 through December 2017, Dr. Thomas issued 91 prescriptions for controlled substances—including 18 for a Schedule II amphetamine, 28 for methadone (a Schedule II opiate analgesic), and 18 for Schedule II opioids—to J.H.

24. Dr. Chambers, the medical expert obtained by DEA, reviewed Dr. Thomas's medical records for J.H. Dr. Chambers noted that while Dr. Thomas diagnosed J.H. with heroin/opioid dependence at their first encounter, Dr. Thomas dangerously and illegally mismanaged the treatment of that diagnosis by, *inter alia*, continuing to prescribe for her a dangerous combination of drugs, including opioids. What's more, Dr. Thomas only administered four urine drug screens for J.H. over the relevant period, and certain of those screens actually came back with results indicative of drug abuse, which Dr. Thomas essentially ignored. As a result, in Dr. Chambers's view, Dr. Thomas's prescribing with respect to J.H. bore no resemblance to legitimate medical practice.

*The Cooperating Source*

25. A DEA Cooperating Source (CS) made multiple visits to Dr. Thomas's "clinic" and obtained multiple prescriptions for controlled substances at every visit. The CS visits occurred in February, March, April, May, June, July, and August of 2018.

26. During the February and March visits, the CS did not see Dr. Thomas at all, but was nevertheless given prescriptions, signed by Dr. Thomas, for various controlled substances, including methadone, a Schedule II opiate analgesic.

27. At the April 2018 visit, the CS saw Dr. Thomas for approximately two minutes and was thereafter provided with five prescriptions, including methadone.

28. During the May and June 2018 visits, the CS was provided with four prescriptions (including methadone) without seeing Dr. Thomas.

29. At the June 2018 visit, the CS again did not see Dr. Thomas but was provided with four prescriptions, including methadone.

30. The July 2018 visit is particularly notable. At that time, the CS told an employee of Dr. Thomas's that he/she was there for refills and indicated that the medications were for addiction. Dr. Thomas entered the exam room and handed the CS three prescriptions, which had seemingly been prepared before the CS had even spoken to Dr. Thomas. The CS then looked at the prescriptions and told Dr. Thomas that he forgot the methadone. At that point, Dr. Thomas briefly left the room and returned shortly thereafter with a prescription for methadone. The CS was not examined by Dr. Thomas at any point, nor was there any conversation about the CS's health or medications, yet the CS was ultimately provided with four prescriptions, including the aforementioned methadone.

31. At the August 2018 visit, the CS saw Dr. Thomas briefly (less than one minute), was not examined, and was issued four prescriptions, including methadone. During this visit, the CS and Dr. Thomas did not have any conversations regarding the CS's health conditions or medication. Dr. Thomas did, however, tell the CS that the CS may have to visit several pharmacies to get the prescriptions filled.

*The Undercover*

32. A DEA Task Force Officer (TFO) acting in an undercover capacity and using the alias S.D. made four visits to Dr. Thomas's office from May 2018 through July 2018, obtaining prescriptions for controlled substances at each visit.

33. At the first May 2018 visit, the TFO spent approximately nine minutes with Dr. Thomas. While the TFO expressed vague comments about not being able to sleep and issues with his knee, neither Dr. Thomas nor his office staff conducted any examination of the TFO. Dr. Thomas gave the TFO a prescription for tramadol (a Schedule IV controlled substance), along with a lidocaine (non-controlled anesthetic) patch for the TFO to apply to his knee.

34. At the second May 2018 visit, the TFO advised an employee of Dr. Thomas's that he wanted something stronger. The TFO did not see Dr. Thomas at this visit but was provided with a prescription for oxycodone (a Schedule II opiate).

35. During the June 2018 visit, the TFO advised an employee of Dr. Thomas's that he wanted a refill and was taking the oxycodone because he was addicted to it. The employee replied that she couldn't write that down but had to document some reason why he was taking it. The TFO told her to write down whatever she needed to. The TFO did not see Dr. Thomas at this visit but was provided with a prescription for oxycodone. The prescription for oxycodone contained a diagnosis code indicating it was intended to treat lower back pain, even though the TFO never mentioned anything about lower back pain.

36. At the July 2018 visit, the TFO did not see Dr. Thomas but was once again provided with a prescription for oxycodone.

*Search Warrant at Oklahoma Avenue*

37. On June 7, 2018, a federal search warrant was conducted by the DEA on Dr. Thomas's practice at Oklahoma Avenue. Inside, investigators recovered various forms of evidence, including, *inter alia*, 150 bottles containing medications, bearing pharmacy labels indicating they were prescribed by Dr. Thomas—including 10 with controlled substances.

*Dr. Chambers's Conclusions*

38. All told, Dr. Chambers reviewed medical records associated with twelve people who had received prescriptions from Dr. Thomas. Dr. Chambers concluded, based on those records, that "Dr. Thomas [was] acting in a fraudulent and dangerous manner . . . prescribing . . . in a way that is completely detached from standards of medical or psychiatric care, and has no legitimate medical justification." Indeed, according to Dr. Chambers, Dr. Thomas's "prescribing patterns, documentation, and practice behaviors are so comprehensively bizarre, chaotic and divorced from standards of care and medical evidence, that he seems like someone who never went to medical school[.]"